Turley, J.
delivered the opinion of the court.
The questions presented for the consideration bf the court in this cause are of much importance,' involving as they do; the taxing power of the State, the privileges of anincoi-póíá- *493 led institution, and the rights of non-resident owners of our bank stock; and they have well merited, and have received-from us a careful and patient investigation. In order to understand correctly the mer'ts of the propositions which have to be discussed^ and decided by the couft, it becomes necessary to exhibit a short statement of the facts out of which they arise.
In the month of October 1832, the legislature of the State 6f Tennessee passed an act by which the Union Bank tvas’ incorporated, the capital stock of which, was limited to three millions of dollars. This statute secures to the corporation many privileges, none of which need be stated, in consideration of which,' the bank agreed to pay to the State; ahnúa'lly, ode* half óf one per cent, on the amount of the capital stock paid in by the Stockholders, other than the State.
In the year 1834, the constitution of the State Of Tennessee was amended, and provide's in section twenty-eight, article three, that all lands, held by deed, grant or entry, town Jots, -bank stock, slakes between the ages of twelve and fifty years, dnd such othe'f property as the legislature may from time to time deem expedient, shall be taxable; that all ⅜ property shall be taxed according to its value, that value tó1 be ascertained in such manner as the legislature shall- direct, so that the same shall be equal and uniform throughout the State; that no one species of property from which a tax may be collected, shall be taxed higher than any other species of property of equal value. In the month of February 1836; the legislature in pursuance of this provision of the constitution, passed an act, by the first sectibn of which it is provided, that all lands in this State held by deed, grant, entry or dower, and town lots other than such as are exempted from taxation as after provided for-, all slaves between the ages of twelve and fifty years, all pleasure carriages; bank stock, other than such as may be exempted from taxation as after provh ded for,* shall be subject to an annual tax of five cents oh every hundred dollars of the value thereof. By the second section of the same act among other things exempted from taxation as provided for- in the first, are specified all stock owned by the State, or by literary, religious or charitable ⅛⅜ *494 stitutions, and all capital stock or property of all such incorporated companies as have heretofore been, or may hereafter be exempted from taxation in their respective charters of incorporation. (Session acts 53.) At the same session another act was passed, by the fifth section of which it is provided, that it shall be the duty of all persons owning property, by themselves or agents, to return to the commissioners the amount thereof in writing, which shall plainly spiecify the number of track of land and town lots, the number of acres in each tract, the situation of each, the cash valuation of each tract, with the improvements thereon, also the number of town lots and parts of lots with the cash valuation thereof, and also the number of slaves liable to taxation with the value thereof, and that the revenue arising on bank stock shall be collected from the bank, on the amount of stock paid into the vaults of the bank by the several stockholders in said bank or banks, and that it shall be the duty of the cashier to list the amount of stock owned in his or their bank, by the several individual stockholders. (Session acts, p. 58.)
Under this constitutional provision and legislative enactment, the tax thus assessed is now sought to be collected from the bank. The first question which is presented is, whether if the construction which the attorney general of the State contends for, should be given to the clause in the amended constitution, and to these acts of the legislature, be correct, their provisions are not, so far as the Union Bank and Planters Bank are concerned, incompatible with that part of the constitution of the United States, which provides, that, “no State shall pass any law, impairing the obligation of contracts. ” (Art. 1, § 10 Con. U. S.) Ever since the determination of the great case of the Trustees of Dartmouth College vs. Wood ward, 4 Whea. R. 518, it has been considered as settled beyond controversy, that a charter of incorporation is a contract, and that any statute altering it in a material respect, without the consent of the corporation, is a law impairing the obligation of the charter and is unconstitutional and void.
It has not been contended that a convention of the sovereign power of the State could by an amendment of the constitution, do that which by the constitution of the United *495 States the legislature is prohibited from doing, neither in our opinion could it have been successfully contended for, for a contract once made, is obligatory upon the parties thereto in morals and in law, until it has been performed according to its spirit and meaning. We repudiate the idea that a convention of a State has more power to violate contracts than the legislature. If it were otherwise, there would bo no safety in times of excitement, under our form of government, for tha most sacred rights. The question then is, does a law imposing a tax on the capital stock of the Union Bank impair the obligation of the contract of incorporation made with the State.
In the case of the Providence Bank vs. Billings and Pitman, 4 Peter’s 514, it is determined by the supreme court of the United States, that a State has the power to tax all monied corporations which have been chartered by her laws, and that a relinquishment of this power is never to be assumed, unless the charter contain a stipulation exempting from taxation, or words which in themselves would justify the opinion, that the power of taxation was in the view of the parties, and that an exemption was intended, though not expressed. This exemption, it is argued, is four d in the eleventh section of the act incorporating the Union Bank, by which the bank agrees, in consideration of the privileges granted by the charter, to pay to the State annually, one half of one per cent, on the amount of capital stock paid in by the stockholders. This, it is said, is the tax to be paid by the bank to the State by express contract, and that being thus taxed, no law imposing additional burthens on the inslitut'oncanbc considered as having any validity. The weight of this argument is felt, and is sought to be obviated by insisting that the one half of one per cent is paid in consideration of the privileges granted by the charter, and is not to be considered as a relinquishment of the right on the part of the State to impose additional taxation on the property of the bank of which tho capital stock forms a portion. It is unquestionably true, that the payment of one-half of one per centón the capital stock is in consideration of the privileges granted by the charter, and does not exempt from taxation any property of the hank not necessarily included in *496 antl 1'0)"',1⅛ a Portion of those privileges, and without which couIdnot possibly Ipo enjoyed. What are the privileges granted-? Anpatig others, the right to use the capital stock of ■t]ie institution for all legitimate-banking purposes. This is the end and design of the act of incorporation, the privileges for which the one half of one per cent ivbs contracted to -be paid} and out of which the fund for áo doing was to be raised. ,How can the privilege of banking, which is given by the .charter, be exercised without a use of the capital stock of the Institution? Can bills or notes be bought or exchange made without money? Surely not. Then when an institution cqn--tracts with the State for the right of doing diese things, .and pays therefor a Valuable consi clei’atiQft, does .it npt.necessarily .follow, that it has contracted .and paid for the use of those means, without which the right would be nugatory. The argument is,you ht|ye paidfor.the privilege qf banking,.and ,yqü .cannot be taxed for that, but you have not-p&id for the privik-ege of using your money for that ¡rarpose, and therefore you shall not do so, without you pay a new consideration. This -is something like the reasoning of the learned judge to Shy/ dock, “you have contracted for your pound of flesh, but seg ,you take no blood.”* It surely cannot be necessary to enter into an argument to prove that if a privilege be purchase;!, every thing absolutely necessary to ⅛.enjoyment is also puiv chased. This is a principle of such every day practice, and *497 so universally admitted, that argument upon it would be a waste of time.
But it is said, that if the use of the capital stock of the institution be necessary to an .enjoyment of the privileges granted, so is a banking house, and the process of reasoning which exempts the one from taxation, would also exempt the other, which is not contracted for on the part of the bank. To this it is answered, that a banking house has no immediate connection with the privileges granted by the State to the Bank, and is only incidentally necessary to their enjoyment, and therefore cannot be assimilated to the capital stock, the. use of which, according to the powers granted by the charter, is in our opinion the substance of the contract with the state, and for which the consideration of half of one per cent was paid. This construction of the contract is strengthened by the wording of the 11th sec. of the charter. If it had been intended to pay only for a naked privilege, without the use of the means for enjoying it, it would seem that a definite sum in gross would have been specified, but instead of this, the consideration is expressed to be one half of one per cent, on the amount of capiral stock paid in, under the idea, as we think, that so soon as it was paid in, it would be used for banking purposes, and having thus become profitable to the institution, it was designed that it should pay a portion of the profits to the state. This shews that the tax, consideration, bonus, or by whatever other name it may be called, of half of one per cent was for, and in consideration of the use of the capital as provided for in the charter, and not for a naked right, an ideal nonentity, which we apprehend no one ever thought of purchasing. Then if the Union Bank in consideration of the payment annually of half of one per cent on its capital stock, has purchased from the state the privilege of employing it in banking operations, does a law which imposes in addition thereto, an annual tax on the same capital thus employed, impair the obligaion of the contract? most unquestionably it does. The bank has agreed to pay one amount, and the state without its consent has superadded another. Then if the construction sought to be given to the clause of the constitution of the state, and the acts of the legislature which have been refered to, be *498 correct, their provisions are in direct violation of the constitution of the United States, and they are so farjts they may seek to tax the capital stock of the Bank, null and void.
But let us enquire in the second place, whether it was the intention of the framers of the constitution, and the legislature of 1836, to impose additional taxation on those corporate institutions, which had been previously brought into existence, and which had contracted to pay a valuable consideration for the privileges which had been granted them. We are clearly of opinion that they did not. The 28th section of the 2nd article of the constitution, which is the one under consideration, in enumerating the different kinds of property which shall be made liable to taxation, mentions bank stock, but not the capital stock of the bank. It can scarcely be necessary to say that by bank stock is meant individual interest in the dividends as they are declared, and a right to a pro rata distribution of the effects of the bank on hand at the expiration of the charter, and that the capital stock of the bank is the whole undivided fund paid in by the stockholder’s, the legal right to which is vested in the corporation, tobe used and managed in trust for the benefit of the members. This clause of our constitution does not direct that the capital stock of any corporation shall be taxed, but has left it to the discretion of the legislature. This brings us to an examination of acts of the 1836, c. 13 and 14, which it has been contended does tax the capital stock of the Union Bank of Tennessee. The 1st section of c. 13, in enumerating the different kinds of property which shall be liable to taxation, mentions bank stock, other than such as may be exempted from taxation as therein after provided for, and subjects it in common with eyery other description of property to an assessment of five cents on every one hundred dollars. The capital stock of a bank is not here enumerated, and the 2nd section of the same statute shows conclusively, that the legislature had a very distinct conception of the difference between bank stock and the capital stock of the bank, (or it provides, among other things, “that all stocks owned by the State, or by literary, religious or charitable institutions, and all capital stock of all such incorporated companies as had therefore been, or might thereafter be ex *499 empted from taxation ill their respective charters of incorporation shall be exempted from the payment of every state county, or other tax. Not satisfied with not having toxed the capital stock of the banks in the 1st sec. of the statute, it seems that out of an abundance of caution they expressly exempt it therefrom by the 2nd sec. provided it be exempted in their charters'of incorporation; manifestly the framer of this statute, must have had in his mind, when he drew this section, the rights of those corporate institutions which had previously contracted with the state to pay half of one per cent on their capital stock, as a consideration for the principles granted them, and believed it to amount to an exemption from taxation. The 5th section of the act of 1836, c. 14: after providing, that all property taxable by law, shall be given in to commissioners at its cash value, further provides, that the revenue arising on bank stock shall be collected for the bank on the amount of stock paid into the vaults by the several stockholders in said bank or banks, and that it shall be the duty of the cashier to list the amount of stock owned in his or their bank, by the several individual stockholders. Was it intended by this section to tax the capital stock of the banks ? surely not. The subject matter again is bank stock, and not the capital stock of the bank. If it had been intended to tax the bank, why re* quire the cashier to list the amount of stock owned by the several individual stockholder’s? a mere statement of the amount of capital stock paid in, would have been amply sufficient for the purpose of ascertaining the amount of revenue to be raised therefrom, and might have avoided some perplexity and trouble. If a tax on the bank was meant by this section, why wish to know who the stockholders were? The knowledge could furnish no additional facility in collecting the revenue from the bank.
We are satisfied that a tax upon the bank was not intended, but that an individual tax on the owners of the stock of the banks was, that the legislature believed that they had the power to tax all the stock, as well that owned by non-residents, as by our own citizens, and that they could compel the bank to pay the tax out of the dividends semi-annually declared, without which the tax intended to be laid on non resident *500 stockholders C0Uld not be collected. This brines us to the _ _ ... and last enquiry, which is, how far the provisions of this 5 th section of the act of 1836, c. 14, can be enforced against the owners of bank stocks of this State.
It is not contended that the state does not possess the power to tax resident holders of bank stock, or stocks of any other description, but to do this constitutionally it must be given in, like other property at its cash value, not what-it might have otiginally cost, for stocks fluctuate in value like all other property, and what cost one hundred dollars to day, may not tomorrow be worth fifty.
The 28th section of the 3rd rrticle of our amended constitution before refered to, provides that all property shall be taxed according to its value, that value to be ascertained in such manner as the legislature shall direct, so that the same shall be equal and uniform throughout the state, and that no one species of property from which a tax may "be collected, shall be taxed higher than any other species of property of equal value; the 5th section of the act of Í836, c. 14, on which we are commenting, makes provision for the listing of every species of property for taxation except bank stock at its cash valuation. But bank stock is to be estimated at what was given for it originally at bank, to wit, in the case of owners of stock in the Union Bank at one hundred dollars a share. This we think is in violation of the article of the constitution above quoted; itmay and will produce inequality. Bank stock is scarcely ever at par, it being generally above or below, and unless it be given in for taxation at its real cash value, one species of property will be taxed higher than another species of equal value. The power to tax non resident stockholders is denied, and we think correctly; from its very nature it must be a tax in personam and not in rein. Stock is in the nature of a chose in action, and can have no locality, it must therefore of necessity follow the person of the owner; it does not partake so much of the character of personal property, as even a debt due, for there is a specific sum of money in the hands of one person, which by contract has to be paid to another, and in some sense it may be said therefore to have locality. But this court at the present term in the case of Brightuell ad- *501 filinislrator, Vs. Mallory and others, has said, “that it is a mistake to suppose that the stock of an individual consists of í L # t so much money owned by him in the bank; the money in the bank is the property of the institution, and to the ownership of which the stockholder has no more claim, than a person has who is not at all connected with the bank. The stockholder has an entire and perfect ownership over his own stock and may sell and transfer it to whomsoever he pleases, and from doing which the bank has no power to restrain him.” It necessarily follows that the capital stock of the bank cannot be taxed as the property of the stockholder, as he has tio legal title to any portion of it, but only the immediate right to receive his share of the dividends as they are declared, and the remote right to his share of the effects on hand at the dissolution of the institution. Then bank stock is not a thing in itself capable of being taxed on account of its locality, and any tax imposed upon it, must be in the nature of a tax upon income, and of necessity confined to the person of the owner, and if he be a non-resident, he is beyond the jurisdiction of the state, and not subject to her laws.
We therefore think that as the Union Bank has purchased from the State, for a valuable consideration, the right to use her capital stock in banking operations, that the State has no power without the consent of the bank to impose any addition* al burthen by way of taxation on the enjoyment of this right, and that the State has no power to raise a revenue from the stock of nonresident owners, but that this may be done from the stock of resident owners, which must however be taxed like all other property, at its cost value, and not at its first cost, so that the equality of taxation intended by the constitution may be preserved: and we also think, that if the stock of our own citizens be taxed, it must be listed for taxation in the county where the owner resided, and that he individually, and not the bank is responsible for the payment of the tax. The judgment will therefore be reversed and rendered for the plaintiff in error.
Judgment reversed.

The learned judge misunderstood the «argument I made on this pointrIt was not ar¿ gued by me, “that the Bank liad paid for the privilege of Banking, and therefore it could not be taxed for that, but that it had not paid for the privilege of using its money for that purpose, and therefore, for this it must pay a new consideration.” The position r assumed was this, “that, inasmuch r,s the Bank had contracted to pay an annual suilt * for the privilege of Banking?or for the privilege of using ité^üoney for Banking purposes) it could not again be taxed for tiding this privilege; that this would probably he a violation of the contract; but fch.at, notwithstanding this, its property of all kinds could be lazed as property, provided it was equally taxed as other property o f the like description; that the capital stock of theBank, was the property or money of the, institution, and that the Legislature* had the right of taxing the móney of the Bank asvloney'or ’ property, provided the law was general and unifdrm throughout the S ate, and that the , Only question was whether the acts of Legislature under consideration, were laws of .this discretion»
It was contended that the privilege of using any description of property in a particular way, did not exempt that property from taxation, — to illustrate which I supposed4, (an argument) the State tó be the owner of large and valuable mines — that fdr the purpose óf vvorking them, slkvc labor was necessary; and that slave labor thus employed was múbh more profitable to the owner — than employed in any other way, but that no slave was permitted to labor in the Wines without a licence fiom the State, for which an annual sum must be paid. In this case the owner would pay an annual sum to the State, for the privilege of using his slave properly in aparlicular way, hut it surety could not be contended thatthe Slaves, as property, because of this piivllege, could ndt be taxed as other slave properly in ilia State.